IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

           Plaintiff

   v.

MARGRETTE COBB,

           Defendant.

REPORT AND
RECOMMENDATION

08-cr-159-bbc-08

_____

## REPORT

The grand jury indicted Margrette Cobb on drug trafficking charges. Before the court is Cobb's motion to suppress statements she made to law enforcement agents at the office of her state probation officer. *See* Dkt. 80. Cobb alleges that she felt compelled to answer self-incriminating questions because she feared that if she did not, then official action would be taken against her on her probation. *See* Aff. of Margrette Cobb, Dkt. 81 at ¶10. For the reasons stated below, I am recommending that the court deny Cobb's motion.

This court held an evidentiary hearing on January 20, 2009. Having heard and seen the witnesses testify, and having made credibility determinations, I find the following facts:

### Facts

In 2006, Margrette Cobb, a resident of Rice Lake, Wisconsin, was convicted of a state drug offense in the Circuit Court for Barron County. Detective Jason Hagen of the Barron County Sheriff's Department had worked on Cobb's case. Cobb was sentenced to three years' probation. In December 2006, Barron County Probation Officer (PO) Richard Green assumed Cobb's supervision. Cobb was a cooperative probationer who presented no problems.

In April 2008, Detective Hagen contacted PO Green regarding Cobb. Detective Hagen and PO Green already knew each other from previous professional contact. Detective Hagen advised PO Green that Cobb was one target of a drug investigation being overseen by the Wisconsin Department of Justice's Division of Criminal Investigation (DCI). Detective Hagen asked PO Green to arrange a meeting between Cobb, Hagen and the lead DCI agent, Dan Bethards, who was stationed in Superior. Agent Bethards and Detective Hagen wished to confront Cobb, then seek her assistance against their primary target. They wanted to do this at the probation office in order to keep secret their request for assistance. PO Green agreed to set up such a meeting by making it look like a routine monthly probation appointment.

On April 10, 2008, Detective Hagen gave PO Green a ride to Cobb's apartment building for an unannounced home visit.[1] Although PO Green would have made such visit sometime that month, he chose this date to accommodate the agents. Cobb was home but had been asleep; even so, she allowed both men to enter. Cobb already knew Detective Hagen and they exchanged greetings. Other than that, Detective Hagen said nothing while PO Green made his usual inspection and asked Cobb the usual questions. PO Green advised Cobb that she would have to provide an observed urinalysis at the probation office. Detective Hagen drove everyone back to the probation office.

Once there, the three passed through the waiting room and entered the secure area of the office through a locked door. Detective Hagen veered off to talk with other probation officers about unrelated matters. At some point Detective Hagen contacted DCI Agent Bethards in

---

[1] It's unclear why Detective Hagen would allow himself to be seen in public with Cobb if he was trying to keep his request for assistance under wraps. Perhaps it was unremarkable in Rice Lake for sheriff's deputies to assist POs, but there is no evidence of this in the record.

Superior to report that Cobb was available right for the requested interview. Agent Bethards started the long drive from Superior to Rice Lake. Elsewhere in the office PO Green arranged for Cobb to provide her urine drop. When she was finished, Agent Bethards had not yet arrived, so PO Green directed Cobb to wait in the probation office's waiting room. He did not tell her that she had to stay; neither did he tell her that she was free to leave. Cobb sat in the lobby and waited by herself for at least 20 minutes, perhaps as long as 45 minutes.

When Agent Bethards arrived he entered the secure area of the probation office and met with Detective Hagen; they commandeered an empty office and advised PO Green that they were ready to talk to Cobb. PO Green returned to the lobby and told Cobb that the agents were ready to talk to her. PO Green told Cobb that he did not know what the agents wanted from her and he advised her that this interview was not part of her probation. PO Green escorted Cobb to the office and left.

The office was about 10' x 12' and sparsely furnished with chairs and a desk. The agents closed the door but did not lock it. They started by providing an overview of their investigation, identifying their primary target, telling Cobb that she also was a potential target, then suggesting that she could get consideration if she would cooperate. Because he was sensitive to the probation office setting of this interview, Detective Hagen told Cobb at least four times that she did not have to talk to the agents, that she was not under arrest and that they would not arrest her even if she declined to talk. Detective Hagen offered to give Cobb a ride home when she was ready to leave.

Cobb responded that "I knew this was coming," referring to the primary investigative target. Cobb agreed to cooperate in whatever fashion she could. A 60 to 90-minute interview

3

followed. The interview was conversational and non-confrontational. Cobb did not appear confused, had no questions and expressed no concerns to the agents. When the interview was over, Detective Hagen gave Cobb a ride home.

ANALYSIS

Cobb asserts that she only submitted to a self-incriminating interrogation because she feared that if she did not cooperate with the agents, then PO Green might revoke her probation. The manner in which Detective Hagen chose to contact Cobb would allow the inference that he was attempting to use Cobb's probation as a lever to pry cooperation out of Cobb. But having heard and seen Cobb, Hagen, Green and Bethards testify, I conclude that Cobb's decision to talk to the agents was legally voluntary.

As a starting point, fear of revocation is not a ground for ruling that a probationer's confession deprived her of her Fifth Amendment privilege. *Minnesota v. Murphy*, 465 U.S. 420, 437-38 (1984) (interrogation by probation officer); *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003)(interrogation at the probation office by ATF). In *Cranley*, an ATF agent wanted to question the defendant about suspected § 922(g) violations. Defendant's probation officer (PO) arranged and attended a meeting between the defendant and the agent in a secure room at the probation office. No one told the defendant that he did not have to answer questions or that he was free to leave. The agent did not believe the defendant's answers, so he had the PO set up a second meeting at the probation office between just the defendant and the agent. Prior to the second meeting, defendant's PO reminded him of his duty to answer questions truthfully. At the second meeting the defendant confessed.

On appeal, the court upheld the district court's finding that, notwithstanding the "coercive atmosphere" of an interview conducted at the office of a suspect's probation officer, the defendant had not been in custody and therefore was not entitled to *Miranda* warnings. 350 F.3d at 620. The court also concluded, in reliance on *Murphy*, that

> the lesser price that consists of a merely plausible fear that invoking one's Fifth Amendment privilege will get one into trouble with the probation authorities is not a heavy enough penalty to excuse the failure to assert the privilege.

350 F.3d at 622.

Bear in mind that this holding arose from a situation in which no one had told the defendant that he did not have to answer the ATF agent's questions; to the contrary, the defendant's PO reminded him that he had a "duty" to answer the agent's questions truthfully.

Contrast that with Cobb's situation: PO Green told her that the agents' request to interview her had nothing to do with her probation. Then Detective Hagen told Cobb at least four times that she was not under arrest, she did not have to talk to them, and that no matter what she chose to do, she would remain free and be taken home. Regardless how Cobb had interpreted her situation leading up to the interview, just before it started Cobb received explicit assurances from her PO and the detective that she would not be punished for keeping her mouth shut. This is the antithesis of coercion.

Coercive police activity is a predicate to finding a confession involuntary, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A defendant's personal characteristics alone are insufficient to render her confession involuntary. *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997). In other words, coercion is determined from the perspective of an objectively reasonable person in

the defendant's position, using the familiar "totality of circumstances" test to determine whether the police used coercive tactics. *See United States v. Montgomery*, ___ F.3d ___, 2009 WL 348846 at *7 (7th Cir. Feb. 13, 2009), citing *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). Cobb does not dispute that she was old enough, smart enough, alert enough, and familiar enough with the system to exercise her free will in deciding whether to talk. Her claim is that her free will was overwhelmed by fear that she would suffer adverse probation consequences if she didn't help the investigators. Although I doubt that this is an accurate assertion of how Cobb actually felt at the time, I decline to convert this doubt to a finding of fact because it doesn't matter. Cobb's alleged fear would not have been objectively reasonable under the totality of circumstances. Cobb's statements to the investigators were voluntary.

## RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court deny defendant Margrette Cobb's motion to suppress her statements.

Entered this 6th day of March, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

March 6, 2009

John W. Vaudreuil
Assistant United States Attorney
660 West Washington Avenue, Ste. 303
Madison, WI 53703

Alan G. Habermehl
Kelly, Habermehl & Bushaw
145 West Wilson Street
Madison, WI 53703

    Re:   United States v. Margrette Cobb
          Case No. 08-cr-159-bbc-08

Dear Counsel:

    The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

    The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

    In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before March 16, 2009, by filing a memorandum with the court with a copy to opposing counsel.

    If no memorandum is received by March 16, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

                              Sincerely,
                              /s/
                              Connie A. Korth
                              Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

      (1) injunctive relief;

      (2) judgment on the pleadings;

      (3) summary judgment;

      (4) to dismiss or quash an indictment or information;

      (5) to suppress evidence in a criminal case;

      (6) to dismiss or to permit maintenance of a class action;

      (7) to dismiss for failure to state a claim upon which relief can be granted;

      (8) to dismiss actions involuntarily; and

      (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).